UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CARRIE ANN KINKADE,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF WEISER, WEISER POLICE DEPARTMENT, BRANDON HATHORN, individually, JASON MAXFIELD, individually, CHIEF GREG MOON,<br><br>Defendants. | Case No. 1:16-CV-00194-EJL-CWD<br><br>**REPORT AND RECOMMENDATION (DKT. 41; DKT. 55)** |

## INTRODUCTION

In this case, Carrie Ann Kinkade alleges that two police officers employed by the City of Weiser, Brandon Hathorn and Jason Maxfield, are personally liable for excessive use of force and arrest without probable cause (false arrest) under 42 U.S.C. Section 1983 and the Idaho Tort Claims Act. Kinkade makes the same claims against the City of Weiser and Police Chief Greg Moon. (Second Amended Complaint, Dkt. 25.)

Pending before the Court are two summary judgment motions.[1] First, Defendants filed a motion for partial summary judgment limited to the false arrest claim against the two officers. (Dkt. 41.) Defendants assert that collateral estoppel applies to bar the claim.

---

[1] In addition to these summary judgment motions, Defendants have filed two motions to strike related to affidavits submitted by Plaintiff in response to the summary judgment motions. (Dkt. 52 and Dkt. 60.) The motions to strike will be ruled on via a separate memorandum decision order from the Court.

REPORT AND RECOMMEDNATION – 1

In a state case related to the same incident, the State of Idaho filed criminal charges against Kinkade for disturbing the peace, a violation of Idaho Code Section 18-6409, and for battery upon certain personnel, a police officer, a violation of Idaho Code Section 18-915(3)(B). On June 3, 2014, a preliminary hearing was held on the matter. During the hearing, the state magistrate judge found probable cause for an arrest based on the battery charge. The charges against Kinkade were later dropped by the State. Defendants assert that, because the state magistrate judge found there was probable cause for the crime of battery upon a police officer, this Court is estopped from revisiting the probable cause question and should dismiss Kinkade's false arrest claim.

      Second, Defendants filed a motion for summary judgment on all claims alleged by Kinkade against the City of Weiser and Police Chief Moon. (Dkt. 55.) Defendants assert qualified immunity applies to these claims. They argue further that no constitutional violation was caused by Chief Moon's alleged failure to train and supervise or by the City's alleged failure to do the same. They argue there was no ratification of the conduct or like-conduct by a policymaker. Instead, they point to the police department's policy manual and to instances of training the officers received prior to the incident at issue.

      The motions are now ripe. Oral argument was held on the motions on December 7, 2017. Having fully reviewed and carefully considered the record, the parties' briefing, and the parties' arguments, and the relevant authorities, the Court issues the following report recommending that Defendants' motions be granted.

## BACKGROUND

On May 21, 2014, Weiser police officers Hathorn and Maxfield responded to a dispatch call to Legends Sports Pub & Grill in Weiser.[2] The owner of the business, Michael Kane, called to request police assistance regarding Kinkade, a customer, after she caused a disturbance by allegedly attempting to confront the cook on duty about a personal matter. (Dkt. 41-1 at 2 ¶ 1.)

When the officers arrived, they discussed the situation with Kane, the cook, and the waitress who was serving Kinkade.[3] Once the officers first approached Kinkade, she was sitting at a table in the dining area of the restaurant with her boyfriend. Hathorn asked Kinkade and her boyfriend to step outside. They both complied. Once outside, Hathorn asked: "What's going on with all that?" Kinkade responded with the question, "All what?" Hathorn clarified, "with the cook back there." Although the video is inaudible for a moment, when audio returns, Kinkade's boyfriend stated: "I can explain that. What happened was…" and Kinkade interjected, motioning for her boyfriend to stop talking. Kinkade next said, "No, I did not walk up to the counter."[4] To which Hathorn responded, "Okay, then tell me what happened. Why am I here?" Kinkade responded by

---

[2] Both deputies were on duty, armed, and in uniform at the time they responded to the dispatch call.

[3] Maxfield was wearing a body camera, which captured footage of the incident. (Exhibit B to Affidavit of Michael Kane, DVD, Dkt. 41.) This recitation of facts is based on the Court's review of the body camera footage.

[4] The staff at the restaurant relayed to the officers that Kinkade got up from her seat in the restaurant and walked to the food pass counter, which was open to the kitchen, to talk to/yell at the cook.

REPORT AND RECOMMEDNATION – 3

returning the question, "I don't know, why are you here?" At this point, the owner, Mr. Kane was also outside the restaurant and is visible on the video.

Hathorn stated he was going to have the owner tell Kinkade and her boyfriend what he wanted. Next, Kane said: "I don't want you guys to come back anymore. I asked you to leave and you wouldn't leave." Kinkade then lifted her right arm and pointed at Kane and responded, "You did not ask us to leave, you're a f[…]ing[5] liar." Hatfield interjected and said, "Hey, he's asking you now, so you're done. You paid. Now you can leave." Here Hathorn motioned with his arm down the road and continued, "If you go back in you will be arrested for trespass." Kinkade's next clearly audible words were, "F[…] you."

Kinkade's boyfriend began stepping away from the scene. Hathorn also moved from his position. Hathorn had been standing several feet in front of Kinkade with her boyfriend to his right. He stepped in the direction of Kinkade, closer to her, and toward her right side, rather than squarely facing her. She turned toward him as he was moving and said, "I can say f[…] you all I want right?" As she said this, she remained standing where she had been during the encounter. As Kinkade spoke, she raised her right arm with her bicep and her forearm forming a 90-degree angle. Her right hand was held straight up toward the sky. With her arm and hand in this position, she bent her elbow, and moved her forearm forward in the direction of Hathorn's face. Neither her arm or hand came in contact with Hathorn's body. As she made the gesture, she again said,

---

[5] All instances of the expletive "fuck" are redacted by the Court in this form throughout the Report and Recommendation.

"F[…] you." Before she finished uttering the phrase, Hathorn grabbed her gesturing right hand with his left hand and pulled it down tight toward the ground. As he did so, he also grabbed her chin with his right hand. Four of his fingers were on the right side of her face and his thumb wrapped tightly under her chin and toward the left side of her face. As he gripped her face he pushed her body in the direction opposite his and toward the street behind them.

    Kinkade responded by pushing Hathorn's right arm away with her left hand. This action removed his hand from her face and pushed his arm above his head. She also released her right hand from the grasp of his left hand and after doing so, used both hands and arms to strike Hathorn several times on his upper body and head area. As this was happening, she said, "You [don't] f[…]ing touch me like that again, f[…]er." Hathorn then moved toward Kinkade, wrapped his right arm around her upper-chest and neck area and dropped her to the ground on the asphalt roadway.[6] The video does not show what happened directly after the take down. However, seconds later, the camera pans back to Kinkade and Hathorn. The video shows her on her stomach with Hathorn pulling her arms behind her back to handcuff her. Hathorn said to her, "you don't put your hand in a cop's face."  Kinkade responded, mentioning something about how he touched her first.

    Kinkade next was walked down the block and around the corner to the parking lot behind the restaurant. She was not wearing shoes because they fell off during the preceding altercation. Kinkade was handcuffed. She was talking to Hathorn and was

---

[6] This action is referred to as a "hip check" in the briefings.

REPORT AND RECOMMEDNATION – 5

visibly and audibly upset. She exclaimed, "If you f[…]ing pull my ass like that up again, I'll f[…]ing turn your ass f[…]ing in."[7] To which Hathorn responded, "You keep walking or you're going to go on the ground."

Once at the car, Hathorn positioned her against the rear right passenger side, facing the vehicle. Hathorn directed Kinkade to spread her feet. Kinkade refused. He directed her to do so again. She again refused. Then, Maxfield said, "Put her on the ground if she is not going to do it." Hathorn took her to the ground immediately after the comment.[8] With Kinkade on the ground, Maxfield directed: "Spread your feet." Hathorn searched her and he questioned: "How many times did I ask you to spread your feet and you said no?" Hathorn then rolled her around on the ground while he performed the search. Hathorn told her to stand back up and helped pull Kinkade to her feet. Maxfield said: "Ma'am we've given you options, you're the one who is not complying with anything we are doing right now." Kinkade responded with "F[…] you," and continued to verbally insult the officers. Hathorn then forced Kinkade into the backseat of the patrol car.[9] There was a brief struggle in the car as the officers secured her seatbelt.

Maxfield drove Kinkade to the Weiser Police Department building's sally port. When Maxfield exited the car, he had a brief exchange with another employee who had

---

[7] Kinkade alleges Hathorn was pulling up on her underwear as he was walking her to the police car.

[8] Hathorn's narrative relates only that "Carrie remained belligerent and refused to comply with commands to spread her feet for a cursory search of her person prior to transport. I forced Carrie to the ground where I rolled her over on each side and conducted the cursory pat down." (Dkt. 41-3 at 9.) Kinkade asserts also that Hathorn placed his knee on her back during the frisk and rolled her around, resulting in cuts, scrapes and bruises to her body.

[9] Kinkade says she was "forced" into the patrol car. This characterization is in line with the Hathorn's statements: "I had to force her into the patrol car, [adding] where she attempted to kick me." (Dkt. 41-3 at 9.)

REPORT AND RECOMMEDNATION – 6

entered the sally port when the car arrived. Explaining the situation, Maxfield commented and repeated once: "She's drunk and wants to play."

The next interaction between Maxfield, Hathorn, and Kinkade occurred when Hathorn opened the rear door to the police car. The first thing Kinkade said was: "I want another officer." She repeated this demand and also said, "get the f[…] away from me. I want another officer." This was repeated a number of times.[10] Meanwhile, officer Hathorn held the rear passenger side door open and instructed Kinkade to get out of the car. Maxfield then said: "Ma'am I am going to give you two options. Option one: you walk out of the car. Option two: you get drug [sic] out of the car." Kinkade's response was, "F[…] off." Maxfield said, "ok" and then moved in toward her on the right side.

The video shows both of Maxfield's hands holding tightly to her hair and pulling her out of the car using that grip. His hands then appear to slide down near her neck and shoulders. Meanwhile, the video shows Hathorn on the other side of the car, pushing Kinkade on her backside. Kinkade, still in handcuffs, spilled out of the car and landed face-first on the concrete floor. She did not appear to be moving at all upon impact. It is not possible to tell from the video if she was momentarily knocked unconscious from the blow as she asserts.[11] Maxfield then instructed her to sit up. The video shows her left leg

---

[10] Defendants assert Kinkade never made this request. (Dkt. 41-1.) However, in the May 22, 2014 Incident Report, No. PD140500352, the supplemental narrative, written by Hathorn, relates "[o]nce inside the sally port she refused to step out of the patrol car, yelling that she wanted another officer." (Dkt. 41-3 at 5.)

[11] According to the Probable Cause Affidavit narrative supplied by Hathorn in the State case, "Maxfield grabbed hold of Carrie's hair and began pulling her out of the backseat. I pushed Carrie from inside the car until she fell out face first on the cement floor of the sally port." (Dkt. 41-3 at 9.)

REPORT AND RECOMMEDNATION – 7

is bleeding from an injury near her knee area. The officers stand her up and walk her into the building.

Once inside, Kinkade is placed in a chair and restraints are applied. The verbal exchanges continue. She requested that photos be taken of her injuries. Maxfield took photos. She was offered medical care for her injuries. She refused the care.

Hathorn issued Kinkade a misdemeanor citation that day for disturbing the peace. Noting she was "intoxicated and enticing [the cook]." (Idaho Uniform Citation No. 27448, Weiser Police Department, May 21, 2014, Dkt. 4-3 at 7.) When she was booked into the jail the incident report, number PD140500352, indicates the disturbing the peace charge, in violation of Idaho Code Section 18-6409, and an additional charge of battery upon a certain personnel, a police officer, in violation of Idaho Code Section 18-915(3)(B).

## DISCUSSION

**1.     Summary Judgment**

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, demonstrates that "there is no genuine issue of any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Galen v. County of Los Angeles,* 477 F.3d 652, 658 (9th Cir.2007). The moving party bears the burden initially to show no material fact is in dispute, and she or he is entitled to favorable judgment as a matter of law. *Celotex,* 477 U.S. at 323. If the moving party meets this initial burden, the nonmoving party must identify facts showing a genuine issue for trial to defeat the

motion for summary judgment. *Cline v. Indus. Maint. Eng'g & Contracting Co.,* 200 F.3d 1223, 1229 (9th Cir. 2000).

### A. *The Collateral Estoppel Defense*

When a court decides an issue of law or fact essential to its judgment in the matter before it, that decision may preclude re-litigation of the issue in a suit based on a different cause of action if the new suit involves a party to the first case. *Allen v. McCurry*, 449 U.S. 90 at 94 (1980). This is the doctrine of collateral estoppel. Collateral estoppel applies only if the party had a "full and fair opportunity" to litigate the issue in the previous case. *Allen* at 95.

Federal courts, in general, consistently give preclusive effect to issues of law or fact decided by state courts. *Id.*; *Wige v. City of Los Angeles*, 713 F.3d 1183, 1185 (9th Cir. 2013). "Congress has specifically required all federal courts to give preclusive effect to state–court judgments whenever the courts of the State from which the judgments emerged would do so." *Allen* at 96. The United States Supreme Court held in *Allen* that collateral estoppel may fairly be applied to Section 1983 civil rights claims.

In Idaho, collateral estoppel bars re-litigation of an issue of law or fact previously determined when the following factors are met:

> (1) the party against whom the earlier decision was asserted had a full and fair opportunity to litigate the issue decided in the earlier case; (2) the issue decided in the prior litigation was identical to the issue presented in the present action; (3) the issue sought to be precluded was actually decided in the prior litigation; (4) there was a final judgment on the merits in the prior litigation; and (5) the party against whom the issue is asserted was a party or in privity with a party to the litigation.

REPORT AND RECOMMEDNATION – 9

*Glass v. Wengler*, No. 1:12-CV-00380-EJL, 2013 WL 6858312, at *15 n.8 (D. Idaho Dec. 30, 2013) (citing *Berkshire Inv., LLC v. Taylor,* 278 P.3d 943, 951 (Idaho 2012)).

In general, the five requirements are met when a court is "asked to give preclusive effect to preliminary hearing probable cause findings in subsequent civil actions for false arrest." *Wige v. City of Los Angeles*, 713 F.3d 1183, 1185 (9th Cir. 2013) (citing *McCutchen v. City of Montclair,* 87 Cal.Rptr.2d 95, 99–101 (1999)).[12] In most cases, the identity of issues requirement is satisfied because the issue at the preliminary hearing is identical to the issue raised by a false arrest claim—i.e. whether the evidence supports a finding of probable cause for the same arrest. *Wige* at 1185–86. "The quantum of evidence required to support a warrantless arrest is the same as the quantum of evidence required to hold the defendant to stand trial." *McCutchen* at 100. A finding that the evidence was sufficient to require the defendant to stand trial for the crimes charged is a finding of probable cause to arrest the defendant "so long as the evidence known to the arresting officers is not materially different from the evidence presented at the preliminary hearing."[13] *Wige* at 1185–86 (citing *McCutchen,* 87 Cal.Rptr.2d at 100); *see also Haupt v. Dillard,* 17 F.3d 285, 289 (9th Cir.1994).

---

[12] The *McCutchen* holding was called into question by the court in *Schmidlin v. City of Palo Alto*, 157 Cal. App. 4th 728, 767–68, (2007), as modified (Jan. 2, 2008). However, other courts in the Ninth Circuit have not followed the reasoning in *Schmidlin*, citing it as dicta. Neither the Idaho state courts or this Court have followed *Schmindlin*.

[13] The reasoning behind this application of collateral estoppel is that the test at the preliminary hearing regarding whether the evidence is sufficient to require a defendant to stand trial and the test of whether there was probable cause for an arrest is the same: in each instance the court determines whether the available evidence would lead a reasonable person to harbor a strong suspicion of the person's guilt. *See People v. Campa,* 36 Cal.3d 870, 206 Cal.Rptr. 114, 686 P.2d 634, 638 (1984) (arrest); *People v. Uhlemann,* 9 Cal.3d 662, 108 Cal.Rptr. 657, 511 P.2d 609, 612 (1973) (preliminary hearing).

Courts in the Ninth Circuit have held, however, that collateral estoppel should be denied when the plaintiff alleges the officer fabricated evidence or lied at the preliminary hearing. *McCutchen,* 87 Cal.Rptr.2d at 101. This is because the evidence known to the officer at the time of arrest is different than the evidence that was available to the reviewing court due to the officer's fabrication or lie. In such cases, it is proper for the court in the later action to allow the party alleging false arrest to show the "true" set of facts. The court should then use those facts to determine whether probable cause existed at the time of arrest. For this exception to apply, the plaintiff must "establish that an officer lied or fabricated evidence to relitigate the issue of probable cause…." *Wige v. City of Los Angeles*, 713 F.3d 1183, 1186 (9th Cir. 2013).

As Defendants properly assert, Kinkade is collaterally estopped from bringing a claim of false arrest in this matter due to the state court magistrate judge's finding of probable cause for the crime of assault upon a police officer. In the State's case against Kinkade, the magistrate judge held a hearing to determine if there was probable cause to bind the State's case and the claims asserted against Kinkade to trial in state district court. During that hearing, Kinkade was represented by counsel. The officer who made the arrest, Hathorn, was called as a witness and was subject to cross examination by Kinkade's attorney. In addition, Kinkade's attorney presented the body camera video footage of the arrest to the magistrate judge during the hearing. The state magistrate judge was shown only a small segment of the video—the portion that recorded the events immediately leading up to and through the arrest.

During the hearing, considering the testimony of Hathorn and the evidence presented through the relevant portion of video footage, the state magistrate judge found there was probable cause for the crime of assault against a police officer sufficient to bind the case to district court. Notably, there was no testimony or video played regarding the events after the arrest that form the bases of Kinkade's excessive force claims.

In her response to Defendants' motion for partial summary judgment, Kinkade cites several cases from the Sixth Circuit that differentiate a finding at a preliminary hearing from a finding of probable cause for an arrest. (Dkt. 47-1 at 6 n.6.) However, the precedent in the Ninth Circuit rejects this view, which was advanced and dismissed as dicta in *Schmidlin v. City of Palo Alto*, 157 Cal. App. 4th 728, 767–68, (2007) (*see infra* n. 11).

Kinkade's most persuasive argument against the application of collateral estoppel is that there are potential inconsistencies between Hathorn's probable cause affidavit for the State's case, the police report he wrote after the arrest, and his testimony before the state magistrate judge during the preliminary hearing. (Dkt. 47-1 at 8.) However, as articulated by the Ninth Circuit in *Wige*, Kinkade must establish Hathorn lied or fabricated evidence to re-litigate the issue of probable cause before this Court.

Kinkade's attorney did, however, have an opportunity to show the state magistrate judge the body camera video footage of the events leading up to the arrest. Although Kinkade contends she was merely gesturing at the time of the alleged bather, the state magistrate judge drew his own conclusion regarding the events recorded on the body camera. Because of this, any inconsistencies introduced by Hathorn's statements in court

REPORT AND RECOMMEDNATION – 12

that day likely had little to no prejudicial effect on the judge's finding of probable cause. For these reasons, the Court concludes that Kinkade's false arrest claim is estopped by the previous state court finding of probable cause related to the charge of assault on a police officer.

Because Kinkade's false arrest claim is barred by collateral estoppel, the Court will recommend her related claim, that the officers lacked probable cause to make the arrest, be dismissed.

### B. *Monell Liability: Application to Claims against the City of Weiser and Chief Moon*

A municipality may be held liable under Section 1983 only when the municipality itself has caused the constitutional violation at issue. *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694 (1978). Municipal liability can be established a number of ways: Plaintiff can prove either that an employee of the city committed the constitutional violation at issue due to a longstanding practice or custom of the local government entity, or that the employee committed the constitutional violation pursuant to a formal policy of the local government entity. *Gillette v. Delmore,* 979 F.2d 1342, 1346–47 (9th Cir. 1992); *see also Price v. Sery,* 513 F.3d 962, 966 (9th Cir. 2008). In these instances, single constitutional deprivations or isolated and sporadic incidents are ordinarily insufficient to establish a longstanding practice or custom to support municipal *Monell* liability. Courts, however, have articulated three situations where isolated constitutional violations may be sufficient to establish liability: "(1) where the person causing the violation has final policy-making authority; (2) if the final policymaker ratified a subordinate's actions; or (3) if a final

REPORT AND RECOMMEDNATION – 13

policymaker acted deliberate indifference to the plaintiff's constitutional rights." *Christie v. Iopa,* 176 F.3d 1231, 1240 (9th Cir. 1999).

Here, the first category does not apply, because Kinkade has not cited any formal policy that led to the alleged constitutional violation. As to the second category, ratification, the plaintiff must show more than the fact that a policymaker had knowledge of an unconstitutional act. *Fuller v. City of Oakland,* 47 F.3d 1522, 1534 (9th Cir. 1995). Instead, the plaintiff must prove that the policymaker approved of the subordinate's act. And, although ratification is a question for the jury, to survive summary judgment, a plaintiff must first establish there is a genuine issue of material fact regarding whether ratification occurred. *Christie v. Iopa*, 176 F.3d 1231, 1238–39 (9th Cir. 1999). Such evidence exists when a plaintiff proves that the "authorized policymakers approve a subordinate's decision and the basis for it." *Saint Louis v. Praprotnik,* 485 U.S. 112 at 127 (1998).

Finally, "deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action" *Christie* at 1240. In other words, the plaintiff must show that the official or city disregarded a known risk or obvious risk of injury to citizens' constitutional rights in making a single decision. *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397 at 412 (1997).

For claims against a municipality based on policy or custom, the municipality may be held liable only where an action is made pursuant to an official municipal policy, and that policy causes a constitutional violation. *Harper v. City of Los Angeles,* 533 F.3d

REPORT AND RECOMMEDNATION – 14

1010, 1024 (9th Cir.2008). The policy may be "explicitly adopted" or "tacitly authorized," *Harper v. City of Los Angeles*, 533 F.3d 1010, 1024–25 (9th Cir. 2008) (citing *Gibson v. United States*, 781 F.2d 1334, 1337 (9th Cir.1986)).

The inadequacy of police training may also serve as the basis for Section 1983 liability. However, "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).

Kinkade argues "[d]efendants Moon and City of Weiser failed to act upon warning of previous incidents of excessive force by Weiser police officers." (Second Amended Complaint, Dkt. 25 at 7.) Kinkade argues further that Chief Moon established a policy or custom of permitting the use of excessive force because he failed to properly train and supervise officers in proper use of force during arrests. *Id*. at 8. Kinkade points to Maxfield's failure to stop Hathorn from using excessive force during the arrest of Kinkade as evidence of the failure to properly train. *Id*. Finally, Kinkade argues that both Chief Moon and the City "turned a blind eye" to other previous alleged constitutional violations committed by police officers, and such inaction made it likely for officers to continue to use excessive force. *Id.*

However, Kinkade does not point to any particular official policy of the City of Weiser that would lead to an arrest without probable cause or the use of excessive force by an officer. The Ninth Circuit has expressly rejected the argument that a municipality "making a decision" to conduct an "inadequate investigation" into conduct of its employees is somehow the promulgation of a policy. *Pitsnogle v. City of Reno*, 501 F.

REPORT AND RECOMMEDNATION – 15

App'x 653, 654 (9th Cir. 2012). A plaintiff must instead show a "decision to adopt a particular course of action." *Id*. Kinkade has not shown such a decision here. Kinkade tries to build a case that it is the custom of Chief Moon and the City to turn a blind eye to the actions of police officers and to not take seriously complaints made about their behavior. For example, Kinkade supplies the affidavit of Shane Darrington, an attorney who has been appointed as a public defender to represent several clients in actions related to the Weiser Police Department (Dkt. 56-4 at 1-2.)[14] Mr. Darrington's affidavit cites approximately five instances where he either raised the issue of Weiser police officers' conduct in the course of a legal proceeding or with the Weiser city attorney, or both.[15] In one instance, City Attorney Charles R. Kroll responded via letter finding the officer's conduct "sufficiently unprofessional" to refer the matter to Chief Moon for review.

Yet, the City's and Chief Moon's responses to these fairly isolated incidents—some of which do not directly implicate violations caused by arrest without probable cause or use of excessive force—do not constitute a decision to adopt a particular course of action requisite for *Monell* liability.

As to inadequacy of training, Kinkade has not produced evidence to show that the alleged inadequacy of training of Weiser police officers is a result of a deliberate or

---

[14] Mr. Darrington represented Kinkade in the state's criminal trial against her related to this incident, CR2014-4878.

[15] The DVD of Officer Samson discussing his arrest re: "mouthy little bitches" and "[i]f I can [sic] get away with it, I woulda put a bullet in the center of each one of their heads: Exhibit A (DVD) to Docket 54-4 was provided to support the statements made by Mr. Darrington in his affidavit. Exhibit E (DVD) to Docket 54-4 was further provided to illustrate an instance of Hathorn allegedly grabbing another person arrested by the Weiser police by the throat during the encounter.

conscious choice by Chief Moon or the City of Weiser. *See Alexander v. City and County of San Francisco,* 29 F.3d 1355, 1367 (9th Cir.1994). Therefore, Kinkade has not met the burden to show a genuine issue of material fact regarding the City's failure to properly train its officers.

Given the record before the Court, there is insufficient evidence for a fact finder to find the municipality or Chief Moon liable. Therefore, the Court will recommend that the Defendants' motion for summary judgment on all claims asserted against the City of Weiser and Chief Moon be granted.

## RECOMMENDATION

**NOW THEREFORE IT IS HEREBY RECOMMENDED:**

1) Defendants' Motion for Partial Summary Judgment regarding the claim of false arrest against the two officers (Dkt. 41) should be **GRANTED**.

2) Defendants' Motion for Summary Judgment regarding all claims against the City of Weiser and Chief Moon (Dkt. 55) should be **GRANTED**.

Written objections to this Report and Recommendation must be filed within fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Dist. Idaho L. Rule 72.1(b), or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.

Dated: **January 23, 2018**

Honorable Candy W. Dale
United States Magistrate Judge